Good morning, Your Honor. Good morning to the panel. It's Chris W. Katzenbach appearing for the appellant, Mr. Simonelli. Your Honor, I'd like to reserve about three minutes for rebuttal, if I can. Sure. If you keep your eye on the clock, we'll help you, too. I will, Your Honor. Your Honor, I'd like to first address the issue that we lead off with, and that's Dr. Lippman's testimony. Your Honor, it's our position that this testimony was not proper expert testimony in any fashion. Let me ask you this. Your client claimed he had emotional injuries. Yes, Your Honor. So they send him off to a psychiatrist to have him examined. Exactly, Your Honor. Psychiatrist comes back and says he has no psychiatric diagnosis, basically. He's not psychiatrically injured. If that had been the limit of Dr. Lippman's testimony, he could have, for example, addressed the criteria that Mr. Simonelli's psychiatrist addressed. And then he goes a step further and he's asked, well, then how do you account for his claimed symptoms? No, I don't think that's what he does. At that point, what he says is that Mr. Simonelli is not a believable person because the record evidence here, and he begins to go into the record evidence as a detective. Okay, well, that's a separate problem. My question that I'm getting at is the psychiatrist says I can't find anything psychiatrically wrong with him and then opines that his, quote, symptoms are being faked. It's malingering. Yes. Is that improper to ask a psychiatrist, well, if you find nothing wrong with him, how do you account for his symptoms? And the doctor says, well, I think he's making them up. Can he say that? I think, Your Honor, that if, just taking that direct question, I think that would be an objectionable question. I think the doctor's area of expertise ends when he says I can find no psychiatric support for his claimed symptoms. At that point, it's up to the jury. He can't be asked to say, then, how do you account for what he is claiming? At that point, Your Honor, unless he can give an account that relates back to some area of science or expertise, I believe that that would be an objectionable question. His account is already given, the expertise that a doctor or psychiatrist would bring. He says that I've looked at the symptoms he's stating. They don't fit a criteria for an emotional distress, and that is the limit of what his expertise can go. He can't be asked, then, how do you account for them? He can be asked how he accounts for them in a scientific or specialized way, but not if that is a springboard to say I don't believe him because he has told false things to some other person on this record that I have reviewed. He can't say I don't believe him because he filed a false tax return. He couldn't say things like that. What he can say is that I can find no ‑‑ he can say in response to that question, he does not meet the criteria that we have set for showing a psychiatric injury, because that's the area of his expertise. His area of expertise is not trying to account for why it is he doesn't meet these requirements, unless, for example, there is some other element of that that would be scientific, perhaps. Counsel, we review the trial court's ruling in this case based on abuse of discretion, do we not? No, Your Honor. I believe that while the admission of expert testimony in broad sense is abuse of discretion, the application of Daubert and Kumo is a question of ‑‑ So you are suggesting this is a Daubert issue? Absolutely, because it goes to the two prongs of Daubert of reliability and ‑‑ Did you raise that at the trial court? Absolutely. We raised it at the trial court both in terms of our motion in limine and both in terms of our motion to strike the testimony after it was over and in terms of our motion for a new trial. And you say that is not ‑‑ Daubert is not reviewed for abuse of discretion? I think the application of Daubert as to whether this is a proper scope of expert testimony is reviewed de novo. It has to be, Your Honor, because Daubert is acting, the court is acting as a gatekeeper. That's essentially a legal standard that the court applies to determine whether the testimony that's being proffered from an expert is both reliable and based on ‑‑ and relevant. Does harmless error apply here? Harmless error could apply here. It wouldn't apply here. I understand your perspective. Hypothetically, if we found that the evidence in this case was overwhelming, if there were an error here, that would not be sufficient. It's not structural, in other words. It's not sufficient in and of itself to overturn what the trial court did. Your Honor, harmless error would apply to any case, and so I acknowledge that. In terms of the rules on admission of evidentiary, it is my belief that the court standard is once evidence has been improperly admitted, it would be the defendant's burden to show that the jury would have reached the same verdict anyway. Well, let me ask you about that. If I understand the way the case was tried, and tell me if I've got this right. I may have it wrong. Your client's position basically is that the school promised him to reproduce these materials in 32-point type, to do it in advance, to bind it in a certain way, and he didn't always get the materials when he was supposed to, and it caused him problems, including graduating late. If I understand the defense, they don't really deny that. Their defense is basically, well, that may have happened, but we did the best we could under the circumstances. Do I have it in a nutshell? Is that basically right? I would think that that would be largely correct, Your Honor. I think that the assumption is that's a defense, but that would be, and I wouldn't say. I mean, they don't dispute that he didn't get the stuff. He says, I didn't get my stuff, and they don't say, yes, he did. They say, we did the best we can, and it was a big deal to pry. I think their evidence is we tried real hard, but just didn't cross the finish line. Okay. My question now is if it was a mistake to admit the psychiatric testimony, which goes to his damages, not to the liability. It goes to whether he has a mental illness. Why couldn't we say, yeah, maybe it was error to have admitted the psychiatric testimony, but the underlying liability question really didn't bear on his credibility, and therefore any error only goes to the damages and not to the liability finding? Well, Your Honor, had Dr. Lipien restricted his testimony to the question of emotional distress, that argument I would understand. But where Dr. Lipien essentially operates as an individual testifying about the merits of the case in support of the university's defense on the merits. In other words, Dr. Lipien's thrust of Dr. Lipien's testimony, among other things, was that just what you described as their defense, we tried as really hard as we could, Mr. Simonelli should have done more for himself. That was the focus of their closing argument on the merits. It had nothing to do with damages. So if Dr. Lipien had confined his testimony to a proper area of emotional distress, then I could understand that position, Your Honor. But when he doesn't do that, you can't sort of back it saying, well, if he had done that, it would have been relevant to damages, because what he actually did wasn't relevant to that at all. It was actually only relevant to his analysis of the record evidence to essentially tell the jury what result to reach. And that went way beyond the question of whether Mr. Simonelli did or did not suffer emotional distress, whether or not the diagnosis of his treating physician was correct or not correct under the DSM. Rather, it went to the whole merits of the case and to basically the thrust of the UC's argument, which was they had done enough to help him. They had bent over backwards. That's what Dr. Lipien was really testifying about. And I think if you read his testimony, that is clearly the thrust of every bit of it. When he says Mr. Simonelli didn't do this, he didn't do that, he didn't do this. Dr. Hoyt said this. He quotes some depositions. He reads documents. So the answer, no, I don't think we can avoid it by saying that his testimony was technically, theoretically limited to emotional distress. It wasn't in this case so limited. Well, I used to try cases. I was in the position that you've been in, and I watched expert witnesses give what amounted to a closing argument in the guise of testimony. In at least one sense, I think that's what happened here as he moved from the narrower to the broader and malingering became the highway to a broader testimony. But in the end, he did give a closing argument, but he didn't say anything different than what the lawyers could and did say in their closing argument. So how does that really become, I understand the impact, but can that be determinative because he doesn't introduce new facts into the mix. He simply collects those facts and offers them up in a persuasive manner in the middle of the trial. Well, first of all, I think giving the imprimatur of an expert testimony is exactly the problem. In other words, everyone knows to trust or not trust lawyers. Jurors understand that. They trust them, don't they? Huh? They trust them, don't they? Absolutely, Your Honor. I think that undoubtedly it's disturbing to every juror to realize that there are lawyers arguing on opposite sides of an issue at the close of a case. But in any event, jurors can understand that. And jurors understand the difference between argument and testimony. But when an expert qualified and with impressive credentials validates the argument that's being made by the other side, he isn't just testifying. He isn't just acting as a lawyer. The jurors are not being said, this is argument. And, Your Honor, you've tried cases. So you understand it's like the very beginning of a case and an opening statement. What does the judge say? You know that. The judge says what the lawyer said is in evidence. But what Dr. Lipien said was evidence. And that's the confusion the jury is going to have. And that's why you don't allow a expert witness to come in and summarize the facts for the jury. And as to the fact whether he just summarized the record evidence, he obviously did not do that. He went way beyond what the record evidence was. He pulled out, for example, deposition testimony from Dr. Hoyt, which was not in evidence. Dr. Hoyt hadn't even asked about that deposition testimony. Didn't stop Dr. Lipien from reading it into the record. Read other documents into the record. He made other assertions about what the record showed, none of which are in the actual trial record or the evidence before the jury. But that's really, and he's relying entirely on the privilege an expert has to go more broadly. For example, if an expert is testimony within the scope of his expertise, he can rely on many things, including stuff that aren't necessarily in evidence, although the court has to be careful on that. But here the court, Dr. Lipien said something way beyond the idea of just argument. It was argument by an expert designed to influence a jury, designed to pick a phrase. He was like an oath helper. I mean, Anglo-Saxon law, swearing that the university's position was right. And I think that is way beyond any standard of expertise that's appropriate in this case. We have other issues, Your Honor. That's regarding the admission of these alternative accommodations. The court noted that our position was once they had promised it, they had to deliver it. And the issue was did they deliver it. The fact that there were alternatives they might have considered, in fact, considered and rejected early on has nothing to do with that issue. Your Honor, at this point, I guess I'd like to reserve my remaining three minutes, if I can. Thanks very much, Mr. Kessenbaum. Good morning. Good morning. Don Willenberg of Gordon and Reese for the Regents of the University of California. The sole finding by this jury was an answer to a special verdict question that was negotiated by the parties that tracks the statutes and that is not at issue on this appeal. Do you find that the university excluded Mr. Simonelli from participating in or denied him the benefit of the university's services, programs or activities or the university otherwise discriminated against him? The jury unanimously answered no. The jury never even got to questions of emotional distress. That's true, but they heard Dr. Lippian basically call this guy a liar and a lifelong liar and opportunist. No. What they heard Dr. Lippian say twice was malingering is not the same as lying. What they heard his own doctor, Dr. Terr, say is malingering is not the same as lying. The district court said I'm going to carefully limit Dr. Lippian's testimony and if it costs time And what exactly is the difference between malingering and lying? The difference is misattribution of the cause and effect relationship of emotional distress. Dr. Lippian wasn't saying that Mr. Simonelli never had emotional distress. What he said was that it did not stem, whatever distress he had did not stem from any delays that related to And he said, and the reason he's reporting this is to get an advantage in the lawsuit. He attributed it to a bad motive. He not only doesn't have this, but he's saying it falsely for secondary gain. That's what the man testified to. He did say that as, but again. Explain to me the difference between that and calling him a liar. Because he is trying to limit it to the facts of the emotional distress. Here's one way that we would all accept medical testimony from a doctor that if someone drops a barbell on their foot And says that caused my toothache, the doctor would say that's a medical impossibility. That didn't happen. What Dr. Lippian said here was it's a psychiatric impossibility given all the other things that have gone on in his life. And not only that, but he's doing it deliberately to try to win money. That is one of the criteria under the DSM, the Diagnostic and Statistical Manual, which is a standard text in the mental health field. What I think Appellant is trying to argue for here is for this Court to, as a matter of law, carve up that standard medical text and say some parts of it we will accept as the basis for proper expert testimony, and some parts we won't. And he's going to do this not based on 702 and not based on Daubert, but on some general free-flowing notion that, well, if the testimony might involve matters the jury is to decide, like credibility, then we won't allow expert testimony there. There's nothing in 702, Federal Rule of Evidence 702 or in Daubert, that would support that. Daubert talks about the liberal thrust of allowing expert testimony, not ways to unduly restrict it. And here we actually track what is called for in 702. Is the testimony based on sufficient facts or data? Well, there's no disputing about how much no one is saying there's not enough data. Lippian conducted nine hours of interviews over three days, reviewed years of medical records and testimony of treating physicians. Second, is the testimony the product of reliable principles and methods? The reliable principles and methods are those set forth in the standard text in the field, the DSM, and in forensic psychiatry, which is not some made-up, non-science junk science. It's got a two-year course at UCLA Medical School. Third, has the witness applied the principles and methods reliably to the facts of the case? No one here said that Lippian misapplied the principles to this case. No one, including appellant's expert, said, oh, you should have reviewed some other records, or you reviewed the wrong records, or you should have conducted the interview differently. So we've got all three elements of 702 properly met in this case, and it certainly was no abuse of discretion for the judge to admit this evidence. So how do you – I mean, I've got to say, I read his testimony, and it did strike me as something that morphed fairly quickly into a closing argument, with lots of little barbs throughout about how the plaintiff gamed the system to get advantage of a single dorm room, and you know I went to Berkeley, and it's not easy to get a single room, and he got a single room. At what point – and I can feel, I mean, there weren't objections at first, and finally the objections started picking up, and ultimately the judge exercises control. In this case, finally, there were a few times that objections were sustained, but how do you keep from having a closing argument in the middle of the trial? How can you really say that all of that testimony related to some kind of expertise? When he's talking about getting a dorm room as an undergraduate at Berkeley, what does that have to do with his expertise? Your Honor, I think it's correct that there are some statements here which – and that is, I think, a perfect example – that are beyond expertise. Then you go to the question here, which is, but are his conclusions and the opinions, which are the real subject of the appeal here, are his conclusions that there was malingering present in this case, somehow not a proper subject for expert testimony? And the conclusions and the methodology to get to them are, whether there are individual stray comments that might be beyond that would, I suppose, go back to the question of would anything have been different? Would any of those constitute anything other than a harmless error? Well, what was his purpose in discussing the dorm room? Wasn't he using that as one of the examples of antisocial behavior, which is one of the elements of malingering? Yes. So, I mean, if he's not – if that's outside of his expertise, then that's one of the legs of the table that gets knocked out. No, I think that what was wrong was not him talking about the single dorm room. What may have been wrong was him saying, I was at Berkeley, single dorm rooms are hard to get. That's a different issue. Well, without that, it makes no sense that he has a single dorm room. I mean, the only point of his comment was that he was manipulating the people at Berkeley. Well, if that's outside of his expertise, and that's what he uses to determine that he has an antisocial streak. Well, that's only a part of it. And, again, I think that the fact that he pointed out that Appellant got the single dorm room, it wasn't just that he got the single dorm room. It was that he got the single dorm room for the purpose of listening to books on tape, which was an accommodation that he was offered and took advantage of while as an undergraduate, which is an accommodation that allowed him to become Phi Beta Kappa at Berkeley undergraduate, which was an accommodation that he requested in August just before law school. That part I understand. But then he goes on and says, and this is just reading from the transcript, one way or the other, he was somehow gaming the system, so to speak. And I'm going to go on to a paragraph about his Bayview apartment at International House. There are only two of those. They're really valuable. And he sought it because he needed light. Now back to quoting. Well, we all know incandescent light will work just fine. That's taking advantage. Well, if we all know it, it's not expertise he's bringing to bear. And, frankly, I'm not sure that I do know that. It strikes me he went pretty far afield in terms of giving testimony that went way beyond his expertise or that was necessary for the jury. If we all know it, then the jury doesn't need to hear it from him. Now, why isn't that objectionable? Again, there are some stray comments that may be, but I do not think that that then lets you leapfrog or bootstrap into saying that his conclusions, which were based on, again, the standard text in the field, are therefore somehow inadmissible. I'd also say that even to the extent that there were these comments, none of them got to prejudice in the sense of telling the jury something, that this was the only way the jury was going to think to itself. Did anybody else testify that Plaintiff was gaming the system? Outside of the lawsuit, but just generally to gain advantage at the university. I'm sorry? Did anybody else testify? Is there other evidence to support the proposition that Plaintiff was, quote, gaming the system? I mean, you're telling me they're going to hear this stuff anyway. I'm not sure they are. They heard plenty of evidence that would have given them reason to question Appellant's credibility. Appellant said, focused on one class in particular, the legal professions class, and said, I wasn't ever getting my materials on time for that class. Witness Holly Parrish actually kept records of what she did in that class and not other classes, and those records showed that, in fact, Mr. Simonelli got his materials often weeks in advance. In fact, in addition, the professor for that class specifically asked Mr. Simonelli a number of times during the class, is everything okay? Are you getting your materials? And he said, Mr. Simonelli replied, yes, everything is fine. Mr. Simonelli said there was a six-week block on my copies from Copy Central that the university imposed, and he also testified, and you can ask the manager of Copy Central and he'll tell you that. When we put on the manager, the manager said there was no block. There was at most once a three- to four-day delay. There were times when Mr. Simonelli said that he was so distressed at what was happening in law school that he snuck inside doors to class, but then on cross-examination, he admitted that there aren't side doors to the classrooms, there's only the front door. He told some people that his pain increased at night, and that's why he needed to go home and take his exams at home. He told others that it lessened. There are plenty of other examples in this testimony of conflicts between things that Mr. Simonelli said and what the record thereafter revealed that would let a jury come to the conclusion that he was not a credible witness on other matters. Again, not only did Lippian say that malingering was not the same as lying and try to distinguish that, and not only did Tehr say that, but the court said that it wasn't going to allow that, and the court should be, the district court should be allowed some discretion and certainly appropriately exercise discretion as to how much to let in and how much not to let in. Hey, I've asked you before, maybe you can, I've just missed your answer, but I'm still missing the distinction between an intentional falsehood with the intention of getting secondary gain on the one hand, malingering and lying on the other hand. What he was not saying was that Mr. Simonelli could not be believed in anything. What he was saying was that Mr. Simonelli's account that he was caused emotional distress by the any delays that happened in getting him his material was malingering, was false. And intentionally false. And intentionally false. And done with the motive of acquiring an advantage in the lawsuit. That was part of it. Counsel, Mr. Katzenbach indicated that the standard of review with respect to Dr. Lippian is not abuse of discretion, but rather de novo review. Do you agree with that? To the extent that it, if this were truly a Daubert issue, I might agree with that. Because courts of appeal do have an independent duty to look at that. But there really isn't a Daubert issue here. This isn't a matter of whether there were adequately reliable methods. You asked another question. That's what I'm gathering, the differences here. This is not a question of his expertise, but rather to what he testified. Is that a correct statement? I think that's absolutely right. And once he, rightly or wrongly, the district court finds that this man is an expert, that's the Daubert question. But what he testifies to, that is reviewed under abuse of discretion, is it not? Correct. And I don't think that this really is a Daubert issue for a variety of reasons. One, it was not first presented to the district court in that way, although it was argued that way more in the new trial motion. In the motion in Lemonet regarding Dr. Lippian, Daubert is included only as an internal citation in another quote from another case. What the argument was there was instead all about this is the province of the jury. You can't let someone come in and talk about something that's the province of the jury. Well, what that is, is asking this Court to take the unprecedented position that there is no expert testimony allowed from forensic psychiatry or malingering that those, because those might deal with an issue of credibility, they must be forever outside the realm of acceptable expert testimony. No case so holds, and this Court shouldn't. This Court should instead uphold the jury's verdict, which is based on piles of evidence about alternative accommodations that we apparently might not have the chance to get to here at this argument, and should reject Plankton's invitation, I'm sorry, Appellant's invitation to make new law that says any delay equals discrimination or new law that says the Court should carve up parts of a standard text in the mental health field and say that some parts are simply not acceptable for expert testimony. Thank you. Counsel back. I'd like to address briefly the last part about carving up the text. I'm not carving up the text. The guys who wrote the DSM-IV did. The DSM-IV has two standards, two parts. One are the diagnostic criteria section, and that deals with, you know, what is a disease and creates differential diagnoses. Then it has another section in which malingering appears, which is called additional conditions that may be a focus of clinical attention. These are not diagnoses. And as Dr. Lipkin acknowledged, they were not diagnoses. They were just simply clinical guidelines. Well, if you were writing the rule in this case, if you were writing a rule that will who are charged with murder and are trying to fake getting out of trial and such as that, how would you write a rule that would permit a psychiatrist to testify that not only is there no mental illness but that the symptoms are being intentionally faked? What would the rule be? The psychiatrist could testify that there is no apparent explanation, there is no scientific or psychological explanation for the claimed symptoms. And would not be permitted to try to explain the symptoms. He would be able to say that there's no, for example, let's take an example. A common claim, for example, is post-traumatic stress disorder. That's often associated with certain dreaming patterns and certain obsessive behavior. If a patient does not report that behavior, then that would be an indication it's not suffering from post-traumatic stress disorder. So a psychiatrist could easily testify that the failure of the patient to report these things, which are directly associated with post-traumatic stress disorder, indicates that post-traumatic stress disorder is not present. The psychiatrist says, I've examined this guy and he has no mental illness. The next question is, well, he goes around telling everybody he thinks he's the pope. How do you explain that? Is the doctor allowed to explain that? The doctor could allow to say that there's no mental, there's no psychiatric explanation for that, yes. That whether he's going around telling people he's the pope, I've seen no psychological evidence to suggest that he actually believes that. Or that he is. Well, I assume at least one person gets to say that. But they're riding in a popemobile, Your Honor, so we know who that is. So I think that the line drawing there, Your Honor, is where I suggest. But I think, Your Honor, that whatever line you draw, it would stop at one question. If, for example, you permitted a doctor to say, I believe he's fabricating. Assuming you allowed him to say that, that would be the end of it. He wouldn't say he's now fabricating. Let me talk about his tax returns. Right? Let me talk about how he beats his wife. Let me talk about, you know, what he did. You know, let me talk about these other things that he's testified inconsistently about. It certainly would not go that far. And as to the Court's question as to is malingering different than lying, the actual statement of what malingering is in the DSM 4 in the section on additional conditions states that the essential feature of malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms. So in order to make that thing, it has to be intentional and it has to relate to symptoms. Thank you. Mr. Wilberg, thank you as well. The case just argued is submitted. We have some visitors today in the courtroom. I think our clockworks are going to stick around for a little bit and visit with you if you'd like, and then we're going to go to the conference room, flip a couple of coins, and then come back and visit with all of you in a little bit. So thank you.
judges: Silverman, Clifton, Smith M.